BALDOCK, Senior Circuit Judge.
The question in this appeal is whether the Government’s suppression of impeachment evidence violated Petitioner Kenneth Conley’s right to due process under the Fifth Amendment.[1] See Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court answered yes and granted Petitioner’s motion to set aside his conviction. See 28 U.S.C. § 2255. We have jurisdiction, id. § 2253(a), and affirm.
I.
The historical facts of this case are well known and need not be repeated in full. See United States v. Conley, 186 F.3d 7, 11-15 (1st Cir.1999) (Conley I); United States v. Conley, 103 F.Supp.2d 45, 49-51 (D.Mass.2000) (Conley II); United States v. Conley, 249 F.3d 38, 40-43 (1st Cir.2001) (Conley III); Conley v. United States, 164 F.Supp.2d 216, 217-21 (D.Mass.2001) (Conley IV); Conley v. United States, 323 F.3d 7, 9-11 (1st Cir.2003) (en banc) (Conley V); Conley v. United States, 332 F.Supp.2d 302, 306-309 (D.Mass.2004) (Conley VI); see also Dwan v. City of Boston, 329 F.3d 275, 276-77 (1st Cir.2003). In 1995, police officers chased four homicide suspects through Boston. The vehicle chase ended when the suspects turned into a cul-de-sac (Woodruff Way). The four suspects fled on foot. One of the first officers on the scene, Michael Cox, gave chase. Cox pursued one suspect, Robert Brown, towards a fence. Meanwhile, other officers arrived at the “confused and changing scene[.]” Conley V, 323 F.3d at 16. Officer Richard Walker arrived fourth; Petitioner fifth. Both Walker and Petitioner joined the foot chase. Other officers in the chase mistakenly took Cox, an undercover officer dressed in plainclothes, as a fleeing suspect. They caught Cox at the fence and proceeded to brutally beat him. The assaulting officers discovered their mistake and dispersed, leaving Cox badly injured. Petitioner ultimately apprehended Brown.
The Boston Police Department Internal Affairs Division (IAD) thereafter commenced an investigation into Cox’s beating. An IAD officer interviewed Walker during the investigation. Walker informed IAD he observed Cox chase Brown towards the fence on Woodruff Way. Walker further stated that he observed a police officer behind Cox, but he could not identify the officer. Walker,, however, subsequently retracted his statement about observing an officer behind Cox.
In 1997, a federal grand jury convened to determine if the officers involved in Cox’s beating used excessive force in violation of federal law. See 18 U.S.C. § 242. An FBI agent interviewed Walker. According to an FBI memorandum memorializing the details of the interview, Walker agreed to take a polygraph examination concerning his retraction of the statement about observing another officer behind Cox. The FBI memorandum, in relevant part, states:
*186 [Walker] felt [compelled to say he saw something during the IAD interview] because he knows [Cox] and likes [Cox and] he felt bad that he could not say what happened and therefore convinced himself that he actually saw someone or something. But since that interview he has convinced himself that he did not actually see anyone behind [Cox] or anyone hit [Cox]. WALKER also suggested that perhaps if he was hypnotised [sic] he might truly recall what was going on versus what he indicates was tunnel vision.
(emphasis added). Walker subsequently refused to take a polygraph examination.
The grand jury subpoenaed Petitioner and Walker to testify during the course of its investigation. Petitioner testified that: he did not observe anyone beating Cox; he pursued Brown to the fence; he did not see anyone between himself and Brown; he pursued Brown over the fence and apprehended Brown. Walker testified that: he did not see anyone beating Cox; he observed Cox chase Brown towards the fence; he observed Brown “flip over” the fence; he observed Cox grab at Brown as he flipped over the fence; and he observed Cox come back down without clearing the fence while Brown landed on the other side of the fence. The prosecutor also questioned Walker about his prior statement to IAD:
Q: [D]id you see someone behind Officer Cox as he was going through the fence?
A: No, I didn’t.
Q: So, why did you say that you did to Internal Affairs?
A: At the time of the interview with Internal Affairs ... I started feeling guilty, like I should have seen more than what really happened.... I sat there, and I’m conjuring up pictures of what he was asking me and what I should have seen. Like I said, I felt guilty not seeing more than what I saw and I should have, but my attention was focused on my chasing this guy towards the fence. Okay? He [the IAD officer] asked me the question, ‘Did I see anyone,’ or whatever the question was, and I was sitting there saying that from where I was, maybe I should have seen someone, and I told him, ‘Yes, I did.’ That’s the reason for my answer.
Q: And why were you feeling guilty?
A: Like I said, I should have seen, things are happening directly in front of you, and you’re sitting there saying, there are four people in this room, but I only saw two. It shouldn’t be that way. I should have seen all four people. It was right in front of me.
Walker further testified he was “sure” about his grand jury testimony. The grand jury did not indict any officers for violating § 242.
A separate grand jury, however, indicted Petitioner for obstruction of justice and perjury. See 18 U.S.C. §§ 1503, 1623. The grand jury charged Petitioner with perjury for his testimony that: (1) he did not observe another individual chase Brown to the fence (count I); and (2) he did not observe anyone beating Cox (count II). The obstruction of justice charge (count III) was derivative of the other two charges. Petitioner pleaded not guilty. The Government produced Walker’s grand jury transcripts during discovery, but not the FBI memorandum. See Fed. R.Crim.P. 16(a)(1)(E).
Trial commenced in 1998. The Government presented the testimony of Cox, Walker, and Brown (the fleeing suspect) to prove Petitioner perjured himself before the grand jury. Cox testified he pursued Brown to the fence and unsuccessfully grabbed at Brown as he scaled the fence. *187 Cox testified that no other officer was ever between himself and Brown. Walker testified he observed Cox chase Brown to the fence. Walker observed Brown scale the fence and Cox grab at him,, but did not observe anything thereafter. -Brown testified he observed an African-American male in black clothing (a description that fit Officer Cox) chasing him as he ran towards the fence and, as he scaled the fence, felt someone touch his foot. After scaling the fence, Brown looked back and observed police officers beating Cox. Brown made eye contact with a tall Caucasian officer (a description that fit Petitioner) who was standing next to the officers beating Cox. Brown testified the same tall white officer arrested him on the other side of the fence.
The jury convicted Petitioner on count I, finding Petitioner perjured himself when he testified he did not observe ány other officer chase Brown to the fence.' The obstruction of justice conviction on count III necessarily followed. The jury acquitted Petitioner on count II, finding Petitioner did not commit perjury when he testified he did not observe any officer beating Cox. We affirmed on appeal, holding (among other things) the Government presented sufficient circumstantial evidence to convict Petitioner. Conley I, 186 F.3d at 19-20. Petitioner subsequently learned the Government failed to disclose impeachment evidence, including the FBI memorandum, in its possession prior to trial. He filed a motion for a new trial, which the district court granted. Conley II, 103 F.Supp.2d at 58 (Keeton, J.). On appeal, we reversed because “the district court did not apply the correct legal test[,]” Conley III, 249 F.3d at 39, and ordered the execution of Petitioner’s sentence. Id. at 47.
Petitioner thereafter filed the instant § 2255 motion in the district court to' set aside his perjury and obstruction of justice convictions. The district court granted the motion, finding Petitioner carried his burden under Fed.R.Crim.P. 33 of showing the suppressed evidence would probably produce an acquittal upon retrial. Conley IV, 164 F.Supp.2d at 223 (Keeton, J.); see also United States v. Wright, 625 F.2d 1017, 1019 (1st Cir.1980) (establishing four elements a defendant must satisfy to be entitled to a new trial under Rule 33). On appeal, we again reversed. The en banc Court, however, withdrew the opinion when it granted Petitioner rehearing. Conley V, 323 F.3d at 11. The en banc Court held the district court incorrectly employed the Wright test when it granted Petitioner a new trial because a new-evidence claim under Wright is not cognizable under § 2255. Id. at 11, 13-14. The en banc Court, therefore, vacated the district court’s decision and remanded the case for the district court to consider Petitioner’s new-evidence claim under Brady, which is. “a settled basis for collateral attack,” Id. at 14, 16. In so doing, the en banc Court ordered the case reassigned to a different district judge. Id. at 15.
On remand, the newly-assigned district judge faithfully followed the Conley V mandate. See Conley VI, 332 F.Supp.2d at 305-306 (Young, C.J.). The court cataloged the “new” or suppressed evidence— the so-called “Brady material,” see Strickler v. Greene, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) — and then considered the evidence individually and cumulatively. Conley VI, 332 F.Supp.2d at 310-12, 315-24. The court concluded the Government’s failure to disclose the FBI memorandum violated Petitioner’s right to due process under Brady because the document could have been used at trial to impeach Walker. Id. at 319. The district court found the remainder of the suppressed evidence immaterial under Bra *188 dy.[2] Id. at 320-22.
II.
On appeal, the Government argues its suppression of the FBI memorandum did not prejudice Petitioner because the memorandum was cumulative of other impeachment evidence in Petitioner’s possession prior to trial. The Government also claims Petitioner would not have used the FBI memorandum at trial and, if he had, he still would not have suffered any prejudice. Reviewing Petitioner’s Brady claim de novo, see Moreno-Morales v. United States, 334 F.3d 140, 145 (1st Cir.2003), we reject the Government’s three arguments.[3]
A.
The Fifth Amendment provides no person shall be deprived óf liberty without due process. U.S. Const. amend. V. In Brady, 373 U.S. at 87, 83 S.Ct. 1194, the Supreme Court held the Government’s suppression of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment. To establish a Brady violation; a habeas petitioner must demonstrate: (1) the evidence at issue is favorable to him because it is exculpatory or impeaching; (2) the Government suppressed the evidence; and (3) prejudice ensued from the suppression (i.e., the suppressed evidence was material to guilt or punishment). Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936.
Impeachment evidence must be material before its suppression justifies a new trial. Wood v. Bartholomew, 516 U.S. 1, 5, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (per curiam). The suppression of impeachment evidence is “material” when a reasonable probability exists “that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.” Strickler, 527 U.S. at 289, 119 S.Ct. 1936. A “reasonable probability” exists if the Government’s evidentiary suppression undermines confidence in the verdict. Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). “This somewhat delphic ‘undermine confidence’ formula suggests that 'reversal might be warranted in some cases even if there is less than an even chance that the evidence would produce an acquittal.” United States v. Sepulveda, 15 F.3d 1216, 1220 (1st Cir.1993); see also United States v. Cunan, 152 F.3d 29, 34 (1st Cir.1998) (explaining a petitioner may be entitled to a new trial under Brady without convincing the court of the certainty of a different outcome). “Thus, ‘the law makes it easier for [habeas petitioners] to obtain a new trial where the government has engineered an unfair trial by withholding material exculpatory [or impeachment] evidence.” *189 United States v. Josleyn, 206 F.3d 144, 153 (1st Cir.2000).
We evaluate the strength of the impeachment evidence and the effect of its suppression in the context of the entire record to determine its materiality. United States v. Bagley, 473 U.S. 667, 683, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Impeachment evidence is important because “if disclosed and used effectively, it may make the difference between conviction and acquittal.”. Bagley, 473 U.S. at 676, 105 S.Ct. 3375. In other words, “[t]he jury’s estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence[.]” Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). That is why, in the Brady context, the Court has repeatedly stressed “the effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others[.]” Kyles, 514 U.S. at 445, 115 S.Ct. 1555 (citing Agurs, 427 U.S. at 112-13 & n. 21, 96 S.Ct. 2392).
The Government’s suppression of impeachment evidence, therefore, can warrant a new trial “where the evidence is highly impeaching or when the witness’ testimony is uncorroborated and essential to the conviction.” United States v. Martinez-Medina, 279 F.3d 105, 126 (1st Cir.2002) (emphasis added). The Supreme Court, for example, has found Brady violations where the Government failed to disclose impeachment evidence that could have been used to impugn the credibility of the Government’s “key witness,” see Giglio v. United States, 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), or that could have “significantly weakened” key eyewitness testimony. Kyles, 514 U.S. at 441, 453, 115 S.Ct. 1555. Suppressed impeachment evidence is immaterial under Brady, however, if the evidence is cumulative or impeaches on a collateral issue. United States v. Dumas, 207 F.3d 11, 16 (1st Cir.2000); see also Moreno-Morales, 334 F.3d at 148 (finding suppressed impeachment evidence that “largely mirror[ed]” disclosed impeachment evidence immaterial); United States v.Gonzalez-‘Gonzalez, 258 F.3d 16, 25 (1st Cir.2001) (finding suppressed impeachment evidence immaterial where the evidence was cumulative of similar disclosed impeachment evidence); Barrett v. United States, 965 F.2d 1184, 1192 (1st Cir.1992) (same); United States v. Sanchez, 917 F.2d 607, 618 (1st Cir.1990) (same). Suppressed impeachment evidence, if cumulative of similar impeachment evidence used at trial (or available to the petitioner but not used) is superfluous and therefore has little, if any, probative value. United States v. Boyd, 55 F.3d 239, 246 (7th Cir.1995); see also Fed.R.Evid. 403 (providing cumulative evidence may be excluded even if relevant).
Similarly, suppressed impeachment evidence has little probative value if additional evidence strongly corroborates the witness’s testimony the suppressed evidence might have impeached. Cf. Strickler, 527 U.S. at 292-94, 296, 119 S.Ct. 1936. The Brady-materiality test is not, however, a sufficiency of the evidence test. Id. at 290, 119 S.Ct. 1936; McCambridge v. Hall, 303 F.3d 24, 37 (1st Cir.2002) (en banc). In Kyles, 514 U.S. at 434-35, 115 S.Ct. 1555, the Supreme Court explained that a habe-as petitioner “need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evi-dentiary basis to convict.”
B.
In this case, the Government’s suppression of the FBI memorandum violated *190 Petitioner’s right to due process under Brady. To begin, the FBI memorandum was favorable to Petitioner because he could have used the document at trial to impeach Walker’s ability to recall. See, e.g., Dumas, 207 F.3d at 16 (recognizing “ability to recall” as a valid impeachment method). ' Indeed, the FBI memorandum, was “highly impeaching.” See Martinez-Medina, 279 F.3d at 126; see also Conley VI, 332 F.Supp.2d at 316-17. Walker’s request to be hypnotized in order to “truly recall” the events preceding Cox’s beating indicates, at best, that he did not remember what occurred on Woodruff Way and, at worst, that he “convinced himself’ of a new version of events to protect his friend, Officer Cox. The implication of the latter undermines Walker’s testimony “[s]ince the evolution over time of a given eyewitness’s description can be fatal to [his] reliability!.]” Kyles, 514 U.S. at 444, 115 S.Ct. 1555; see also Moreno-Morales, 334 F.3d at 148 (acknowledging “the impeaching power of a witness’s evolving story.”).
Next, the Government wisely conceded it improperly suppressed the FBI memorandum. See Conley VI, 332 F.Supp.2d at 309, 312 & n. 8. While new trials are not granted under Brady to punish prosecutors, see Agurs, 427 U.S. at 110, 96 S.Ct. 2392, we need not entirely ignore the Government’s failure to disclose evidence. See Sepulveda, 15 F.3d at 1220. As Judge Posner explained, the “gravity of the prosecutors’ misconduct is relevant only insofar as it may shed light on the materiality of the infringement of the defendants’ rights; it may support, but it can never compel, an inference that the prosecutors resorted to improper tactics because they were justifiably fearful without such tactics the defendants might be acquitted.” Boyd, 55 F.3d at 241.
We thus turn to the dispositive materiality inquiry. The question is whether the Government’s suppression -of the FBI memorandum, viewed in the context of the entire record, undermines confidence in the outcome of Petitioner’s trial. The Government presented the testimony of Cox, Walker, and Brown to prove Petitioner perjured himself when, he denied seeing Cox pursue Brown (count I). The trio’s testimony provided sufficient evidence to convict Petitioner.[4] See Conley I, 186 F.3d at 19-20; Conley V, 323 F.3d at 16. The weakness in the Government’s case, however, “lies in the absence of any direct evidence as to what [Petitioner] in fact observed during the early morning hours of January 25, 1995 in the cul-de-sac at the end of Woodruff Way.” Conley I, 186 F.3d at 19; see also Conley V, 323 F.3d at 16 (explaining the Government’s evidence at trial was “always circumstantial because no one testified that he or she saw [Petitioner] looking at Cox in pursuit of Brown and [Petitioner] never admitted seeing him.”); Conley VI, 332 F.Supp.2d at 324 (detailing the troubling aspects of the Government’s “highly circumstantial” case). The Government’s case, therefore, hinged entirely on the credibility of its witnesses. See Conley I, 186 F.3d at 20; Conley IV, 164 F.Supp.2d at 223; Conley V, 323 F.3d at 16.
Cox, as the district court recognized, “was an extraordinarily sympathetic victim — a Boston police officer struck down in the line of. duty, viciously beaten and permanently injured by fellow officers.” Conley VI, 332 F.Supp.2d at 315. Cox’s testi *191 mony, however, raised serious problems for the Government. For example, Cox testified (unlike any other witness) that “[he] saw two [suspects] run towards the fence[.]” The Government explained this discrepancy in closing by arguing a “concussion” may have affected Cox’s ability to recall. The evidence supported the Government’s explanation. Cox suffered severe head trauma as a result of the assault, losing consciousness and memory at the scene. Thus, as the Government argued, Cox’s head trauma tragically limited the evidentiary value of his testimony.
Brown’s testimony also proved problematic. Petitioner impeached Brown with evidence of his previous felony convictions. See Fed.R.Evid. 609(a). Brown also testified (unlike any other witness) that he observed a tall white officer- — Petitioner, according to the Government — standing next to the officers beating Cox. The jury, however, ostensibly rejected Brown’s testimony about Petitioner’s position at the scene of the beating because it acquitted him on count II (i.e., for testifying he did not observe anyone beating Cox). Consequently, Brown’s testimony had little, if any, corroborative value.
Given the inherent weaknesses in Cox’s and Brown’s testimony, the Government relied heavily upon Walker’s testimony. Walker provided a critical link in the Government’s chain of circumstantial evidence; namely, a disinterested eyewitness account of the chase. See Strickler, 527 U.S. at 293; 119 S.Ct. 1986 (recognizing the importance of disinterested eyewitness testimony). A fair reading of Walker’s testimony in the context of the entire record confirms that his testimony was the linchpin of the Government’s case on count I. Tellingly, the Government never argues otherwise despite the district court’s same conclusion. See Conley VI, 332 F.Supp.2d at 315.
Prior to trial, however, Petitioner • did not know the Government’s key witness previously suggested he be hypnotized to “truly recall” the events preceding Cox’s beating. Without any other similar material, Petitioner did not impeach Walker’s ability to recall at trial. Consequently, the Government’s suppression of the FBI memorandum deprived the jury of critical information. See Giglio, 405 U.S. at 154-55, 92 S.Ct. 763 (explaining the jury is entitled to know of impeachment evidence when such evidence could impugn the credibility of. a key witness). “Disclosure of [the FBI memorandum] would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense.” Kyles, 514 U.S. at 441, 115 S.Ct. 1555. A cross examination of Walker that raised serious doubts about his ability to recall could have changed the course of Petitioner’s trial. Cf. United States v. Cuffie, 80 F.3d 514, 519 (D.C.Cir.1996); Conley VI, 332 F.Supp.2d at 316. This is particularly true given the Government’s acknowledgment to the jury of Cox’s memory problems and Brown’s lack of credibility. Because Walker was essential to the Government’s case, and his personal credibility potentially dispositive, the Government’s suppression of the FBI memorandum may have made the difference between a conviction or acquittal of Petitioner on count I. Bagley, 473 U.S. at 676, 105 S.Ct. 3375. The Government’s suppression of the FBI memorandum undermines confidence in Petitioner’s count I conviction because a reasonable probability exists the verdict would have been different if the Government disclosed the memorandum to the defense. Kyles, 514 U.S. at 434, 115 S.Ct. 1555. Therefore, the Government’s suppression of the FBI memorandum was material under Brady.
C.
The Government’s three arguments to the contrary are unpersuasive. First, the *192 Government argues the FBI memorandum is immaterial under Brady because it is cumulative of Walker’s properly disclosed grand jury testimony. This argument fails because, as every judge to consider the evidence has concluded, it mischaracterizes the evidence. See Conley IV, 164 F.Supp.2d at 223 (Keeton, J.) (concluding “the newly discovered evidence is highly probative and neither immaterial nor cumulative in nature.”); Conley VI, 332 F.Supp.2d at 316 (Young, C.J.) (finding the FBI memorandum opened an entirely new, and hence not cumulative, line of cross examination); Conley V, 323 F.3d at 30-31 (Torruella, J., dissenting) (asserting the “undisclosed impeachment evidence is„ for the most part, minor and cumulative[ ]” and then dismissing Walker’s hypnotism statement as weak, but not cumulative, impeachment evidence).[5]
We agree the FBI memorandum is not cumulative of Walker’s grand jury testimony. The FBI memorandum indicates Walker was so unsure of his memory that he suggested hypnotism to “truly recall” the events antecedent to Cox’s beating. By contrast, Walker’s grand jury testimony indicates he was “sure” of his testimony regarding the events antecedent to Cox’s beating. The grand jury transcripts indicate Walker embellished before the IAD because he wished he could have seen more, but the transcripts do not indicate that Walker could not remember what he did testify to seeing during the chase. Walker’s grand jury transcripts thus provided Petitioner, at most, with the opportunity to impeach Walker based upon his prior inconsistent statement and bias. The transcripts did not, however, provide Petitioner with any basis to impeach Walker’s ability to recall, an entirely different form of impeachment.[6] See Dumas, 207 F.3d at 16; Conley VI, 332 F.Supp.2d at 318. We therefore reject the Government’s argument because suppressed impeachment evidence “can be immaterial because of its cumulative nature only if the witness was already [or could have been] impeached at trial by the same kind of evidence.” Cuffie, 80 F.3d at 518 (emphasis added); United States v. O’Conner, 64 F.3d 355, 359 (8th Cir.1995).
Second, the Government argues Petitioner would not have used the FBI memorandum at trial even if it had been properly disclosed. Specifically, the Government postulates Petitioner needed to embrace Walker’s testimony to prove he arrested Brown, thereby distancing himself from Cox’s beating for purposes of defending against the perjury charge in count II. This argument fails because its premise is flawed. Petitioner did not need to embrace Walker’s testimony to establish he arrested Brown. Petitioner presented uncontroverted evidence at trial that he arrested Brown. Furthermore, the Government never disputed that Petitioner arrested Brown. Instead, the Government took the exact opposite approach. The prosecutor told the jury in opening that “there is no dispute in this trial that the [Petitioner] did chase Brown eventually and he eventually caught up *193 with him and he arrested him[.]” The Government reiterated its point in closing: “[Petitioner] tells you, and the evidence is not disputed, he chase[d] a suspect from a shooting several hundred yards, he captures him at gun point, [and] he handcuffs him[.]” Further, as the district court explained, Petitioner could have impeached Walker’s ability to recall what happened during the rapidly evolving situation preceding Cox’s beating while simultaneously embracing Walker’s testimony during the naturally less chaotic events after Brown’s arrest. Conley VI, 332 F.Supp.2d at 318.
We also reject the Government’s related argument that Petitioner would not have used the FBI memorandum to impeach Walker’s ability to recall because he made a strategic decision not to use Walker’s grand jury transcripts at trial. The reasons for not impeaching Walker with the grand jury transcripts are palpable from the record. Impeaching Walker with his prior inconsistent statement about observing another officer behind Cox would have permitted the Government to rehabilitate Walker on redirect with his prior consistent statement, also made under oath before the grand jury, that he did not see another officer behind Cox. See Fed.R.Evid. 801(d)(1)(B); see also Conley VI, 332 F.Supp.2d at 315 (explaining Petitioner “could well have impeached Walker with his known instances of improper embellishment, but would inevitably have faced the [Government riposte that Walker had laudably given complete testimony and ought be considered credible because he had included the details favorable to [Petitioner].”). At the same time, such questioning would have opened the door for the Government to address Walker’s motive for making the inconsistent statement, namely, his sympathy for Cox. Therefore, impeaching Walker with the grand jury transcripts would have harmed more than helped Petitioner’s cause. We do not ignore these realities of trial when engaged in a Brady analysis. Cf. Cunan, 152 F.3d at 35.
Third, the Government argues the FBI memorandum, even if disclosed and used at trial, is still immaterial under Brady because “Brown’s and Cox’s testimony provided sufficient evidence for the jury to convict [Petitioner], even without Walker’s testimony.”[7] Supreme Court and Circuit precedent clearly foreclose this argument. Kyles, 514 U.S. at 434, 115 S.Ct. 1555; McCambridge, 303 F.3d at 37. The question is not whether Petitioner would more likely than not have received a different verdict with the FBI memorandum, but whether in the memorandum’s absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Kyles, 514 U.S. at 434, 115 S.Ct. 1555. We answer no after careful review of the record.
III.
We do not take our task in this case lightly. Ordering a new trial is a drastic *194 remedy that exacts substantial costs on the administration of justice and taxpayers. Those costs are justified, however, “where serious doubts about the reliability of a trial infested with constitutional error exist.” Bartholomew, 516 U.S. at 8, 116 S.Ct. 7. The district court’s order granting Petitioner’s motion to set aside his conviction under 28 U.S.C. § 2255 is therefore
AFFIRMED.

. The Government's good faith (or lack thereof) in failing to disclose favorable evidence is irrelevant. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Strickler v. Greene, 527 U.S. 263, 282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). For ease of exposition, we (like the Supreme Court) refer to the Government’s nondisclosure of favorable evidence as the "suppression” of evidence. See Brady, 373 U.S. at 87, 83 S.Ct. 1194; Strickler, 527 U.S. at 282, 119 S.Ct. 1936.

. We do not express any opinion on the remainder of the suppressed evidence, including Brown’s booking report, because the Government’s failure to disclose the FBI memorandum warrants habeas relief. As the en banc Court predicted, the district court’s "well-worked-out assessment” greatly assisted our evaluation of Petitioner’s Brady claim. See Conley V, 323 F.3d at 15.

. Some tension exists within this Circuit over the proper standard of review for Brady claims raised in a § 2255 motion. The materiality question under Brady — -the third Brady component going to constitutional error — is a mixed question of law and fact. Ouimette v. Moran, 942 F.2d 1, 4 (1st Cir.1991). Some deference to the district court's resolution of fact-dominated questions in the Brady context is therefore due, even on collateral review. Cf. id.; Ellis v. United States, 313 F.3d 636, 641 (1st Cir.2002). In Moreno-Morales, 334 F.3d at 145, however, we reviewed a Brady materiality question raised in the context of a § 2255 motion de novo. We need not resolve the tension in this case because Petitioner prevails even under the more onerous (or less deferential) de novo standard..

. The dissent, no doubt, applies a sufficiency of the evidence test to conclude the Government’s suppression of the FBI memorandum was immaterial. See dissent op. at 195-97. The dissent’s application of the incorrect legal test leads, unsurprisingly, to its indignation, id. at 2, ability to distinguish analogous cases, id. at 12 n. 4, parade of horribles, id. at 18-19, and bewilderment concerning today’s holding, id. at 13, 16.

. We do not read today’s dissent as suggesting otherwise. To the contrary, the dissent (correctly and critically) notes the FBI memorandum contains two "pieces of information” that Petitioner did not previously know: Walker's hypnotism statement and his (un)willingness to submit to a polygraph test. See dissent op. at 197.

. The dissent claims that we have adopted a "new Brady rule” based upon an argument first appearing in the district court’s opinion. See dissent op. at 198. As the dissent implicitly acknowledges, however, Petitioner argued the distinction between impeachment based on ability to recall and bias in his "opening brief” after remand in Conley V. As a result, waiver is not an issue in this case.

. The Government also asserts that “pointing out Walker's inconsistent statements about whether someone was behind Cox would not have directly undermined Walker's testimony that he saw Cox pursuing Brown; Walker never deviated on this point.” This is true, but not true enough. See Kyles, 514 U.S. at 443 n. 14, 115 S.Ct. 1555. The inconsistencies between the two bodies of testimony "provided opportunities for chipping away on cross-examination but not for the assault that was warranted.” Id. The Government also misses the point. Walker’s entire testimony— even that from which he never deviated— could be called into question if Petitioner impeached his ability to recall the events preceding Cox’s beating. The issue was Walker’s credibility, not whether he actually saw someone behind Cox.