# United States Court of Appeals
## For the First Circuit

Nos. 13-1938, 13-1945, 13-1946

PAUL A. DECOLOGERO, PAUL J. DECOLOGERO, and
JOHN P. DECOLOGERO, JR.,

Petitioners, Appellants,

v.

UNITED STATES OF AMERICA,

Respondent, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Selya, Circuit Judge,
Souter,* Associate Justice,
and Lipez, Circuit Judge.

Matthew D. Thompson, with whom Butters Brazilian LLP was on brief, for appellant Paul A. DeCologero.
Jeanne M. Kempthorne for appellant Paul J. DeCologero.
Mark W. Shea, with whom Jean C. LaRocque and Shea and LaRocque, LLP were on brief, for appellant John P. DeCologero, Jr.
Jennifer Hays Zacks, Assistant United States Attorney, with

_____

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

_____

September 21, 2015

_____

**LIPEZ**, **Circuit Judge**.  Appellants Paul A. DeCologero ("Paul A."), Paul J. DeCologero ("Paul J."), and John P. DeCologero, Jr. ("John Jr.") were members of a Boston-based criminal organization known as the "DeCologero crew."  In 2006, all three were convicted of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and a number of related crimes.  Appellants have now moved under 28 U.S.C. § 2255 to vacate their convictions.  Their motions are based on two Federal Bureau of Investigation ("FBI") reports that they claim are exculpatory evidence that the prosecution should have produced before trial under Brady v. Maryland, 373 U.S. 83 (1963).  The district court denied the motions, finding that the prosecution team was not aware of the reports prior to the trial and that the reports were not material for Brady purposes.  We only address the materiality issue and affirm on that basis.

## I.

We recite the pertinent facts in the light most favorable to the verdicts.  Bucci v. United States, 662 F.3d 18, 20 (1st Cir. 2011).  The facts are described in greater detail in our opinion on the direct appeals.  See United States v. DeCologero, 530 F.3d 36 (1st Cir. 2008) ("DeCologero I").

In the 1990s, Paul A. ran the "DeCologero crew" criminal enterprise out of a gym he operated in Woburn, Massachusetts.  His nephews Paul J. and John Jr., and other associates, assisted Paul

A. in his efforts to control part of Boston's drug trade. The crew traded in guns and drugs, and used force to compete with rival criminal factions.

## A. The Silva Murder

In 1996, members of the crew, acting on orders from Paul A., murdered a 19-year-old woman named Aislin Silva, because Paul A. was afraid that she would betray the crew to the police. The testimony at trial regarding Silva's killing came primarily from Stephen DiCenso, a former member of the DeCologero crew who was closely involved in the murder. According to DiCenso, in November 1996, the police found a stash of guns that the DeCologero crew had hidden in Silva's apartment. Paul A. decided to kill Silva because he was afraid that she would implicate him and his associates if the police interrogated her about the guns.

Initially, Paul A. planned to get Silva to overdose on heroin, and he instructed Paul J. to acquire some high-grade heroin for that purpose. DiCenso and another DeCologero crew member, Kevin Meuse, then gave Silva the heroin and told her that it was good cocaine. She took the heroin but did not overdose. When that plan failed, Paul A. ordered Meuse to kill Silva by force. DiCenso testified that Meuse brought Silva to DiCenso's father's apartment and killed her by breaking her neck. DiCenso and Derek Capozzi, another DeCologero crew member, subsequently arrived at the apartment to help Meuse dispose of the body. The three of

them dismembered her body in a bathtub, stuffed her body parts into plastic garbage bags and gym bags, and then drove to Home Depot to purchase a shovel and other items to assist with Silva's burial. Then, they drove to a wooded-area on the North Shore of Massachusetts and buried her remains there. They disposed of the garbage bags and gym bags in a dumpster in Danvers, Massachusetts.

DiCenso's testimony was corroborated by the testimony of two other former members of the DeCologero crew, John P. DeCologero ("John P.") and Thomas Regan. As a crew member, Regan took orders from Paul A. and robbed a number of Boston-area drug dealers with other associates. John P. was the brother of crew leader Paul A. and father of Paul J. and John Jr. John P. testified that he had heard Paul A. say that the heroin intended to kill Silva did not work. He also testified that John Jr. told him that Meuse had killed Silva and that DiCenso and Capozzi had helped Meuse dispose of her body. Regan testified that Paul A. told him that Meuse and DiCenso had killed Silva and cut up her body.

DiCenso's testimony was also corroborated by physical evidence, including the bloody trash bags and gym bags found in the dumpster in Danvers. DNA from the blood, hair, and tissue on the bags belonged to Silva. A security video from Home Depot showed Capozzi and Meuse leaving the store with a shovel and other items; a receipt from the Home Depot included the purchase of a shovel, gloves, and flashlights. Packaging for the flashlights

and gloves was found in the Danvers dumpster. Meuse's fingerprint was also found on an item in the dumpster.

At trial, appellants attempted to argue, with little success, that another Boston-based criminal organization led by Vincent Marino, also known as Gigi Portalla, was responsible for Silva's murder. First, appellants contended that DiCenso was actually a member of Portalla's crew, not the DeCologero crew, because DiCenso had allegedly told a government informant that he worked for Portalla. However, on cross-examination, DiCenso denied that he made the statement and said that he had not worked for Portalla. Second, Portalla was seen at Silva's apartment a few weeks before her murder. However, the evidence demonstrated that Portalla was there with Paul A. to inspect the guns stored at the apartment to see if he wanted to purchase any guns from the DeCologero crew's stash. Finally, appellants argued that Regan was lying because he was not a member of the DeCologero crew, but in fact was a member of the rival Salemme faction.

Appellants' case was hurt by their failure to get Portalla and his associates to testify at trial. Paul A.'s initial witness list included Portalla and Portalla's crew members Charles McConnell and Robert Nogueira. However, Nogueira had died years earlier, and McConnell was never subpoenaed. Portalla was subpoenaed during trial, but he was in federal custody at the time, and could not be transferred quickly enough to testify. Paul A.

appealed the district court's refusal to expedite Portalla's transport from a federal penitentiary in Pennsylvania or to provide a continuance until Portalla had arrived. We affirmed the district court's decision, faulting Paul A. for waiting until the middle of trial to make his request and stating that Portalla's proffered testimony was "tangential and potentially cumulative." DeCologero I, 530 F.3d at 75.

For his part in ordering Silva's death, Paul A. was convicted of witness tampering conspiracy, witness tampering by misleading conduct, witness tampering by attempting to kill, and witness tampering by killing. Several predicate acts underlying his substantive RICO conviction also stemmed from his role in Silva's death. Paul J. was convicted of witness tampering conspiracy, witness tampering by misleading conduct, and witness tampering by attempting to kill; the latter two crimes were also predicate acts for his RICO conviction. John Jr. was not charged with any offenses relating to the Silva killing. All three were also convicted of other crimes not directly relevant to this appeal. Paul A. received a life sentence, Paul J. was sentenced to 25 years, and John Jr. was sentenced to 210 months. On direct appeal, we affirmed their convictions and sentences. See id. at 79.

**B. The FBI Reports**

In September 2010, more than four years after appellants' convictions, Paul J.'s former attorney received a fax containing two FBI reports describing interviews with a woman named Michelle Noe (the "Noe reports"). According to the reports, the interviews with Noe took place in the fall of 1999, about two years before appellants were indicted by a federal grand jury[1] and three years after Silva was killed. The first report is three pages and describes two interviews that Noe had with Lt. Eugene A. Kee Jr. of the Massachusetts State Police and Detectives Thomas J. Romeo and Michael P. Murphy of the North Reading Police soon after she was arrested on an outstanding warrant for an unarmed bank robbery on September 10, 1999. Noe reported that, in mid-November 1996, McConnell -- her then-boyfriend -- came home in a panic with his clothes and arms covered in blood. After washing the blood off his arms, McConnell put the bloody clothes in a green garbage bag, and left the house. About 30 minutes later, Noe looked outside the window and saw McConnell talking to Portalla on the sidewalk. When McConnell returned to the house, he initially told Noe that Portalla would kill her if he told her what had happened. Eventually, McConnell said, "I did something, I can't believe I did. She was your age. I'm not going into details. Remember the

---

[1] Appellants, and several co-defendants, were indicted as part of a 23-count indictment on October 17, 2001.

- 8 -

girl I used to take you by the house with [Portalla]. She worked at MVP. We did something to her, she ratted." McConnell stated that Portalla and Nogueira were with him at the time, and if the police talk to Noe, she should say that McConnell was with her the entire evening. Although the report does not identify Silva by name, the parties do not dispute that Noe was referring to Silva as the girl who "worked at MVP," a sporting goods store.

Later (Noe was not sure of the time frame), when the news reported that human remains were found in a dumpster, McConnell told Noe, "They're going to put the puzzle together. I had to get rid of the knife in salt water." Noe also stated in the interview that she had visited Silva's apartment in Medford, Massachusetts with McConnell and Portalla at least ten times over several months, and had seen Nogueira at the apartment at least twice. Noe added that McConnell had told her that Silva would purchase cocaine from Portalla and that Silva had been storing guns for Portalla in exchange for cocaine.

Only one page of the second FBI report is in the record. It describes an October 7, 1999 interview of Noe with Lt. Kee, along with Lt. Vincent Martin and FBI Special Agent Charles Gianturco. Noe reported that in mid-November 1996, McConnell and Portalla came to her apartment and tortured her by drugging her and burning her back. The one page of the report does not explain

why they tortured her, or whether this event was related to the Silva killing.

## C. The § 2255 Motions

In 2011, all three appellants filed § 2255 motions, arguing that the government violated their Fifth Amendment due process rights under Brady by failing to disclose the two Noe reports before trial. The motions were handled by the same district court judge who presided over appellants' trial in 2006. She denied appellants' § 2255 motions without holding an evidentiary hearing. See United States v. DeCologero, No. 01-10373-RWZ, 2013 WL 3728409, at *10 (D. Mass. July 11, 2013) ("DeCologero II"). The court provided two independent reasons for its decision. First, it held that appellants "have not shown any Brady violation" because they "have not shown that the prosecution team or any of its agents knew of the [Noe] exculpatory reports" before trial. Id. at *5. Second, the court held that, even if the prosecution team had been aware of the Noe reports, "the reports were not material for Brady purposes" because they "do not raise a reasonable probability of a different outcome on the counts related to the Silva killing [or] on unrelated counts." Id. at *6-*7. The district court granted a certificate of appealability "as to petitioners' Brady claims based on the FBI reports," id. at *10, and appellants timely filed this appeal.

Appellants contend that the district court erred by denying their § 2255 motions without holding an evidentiary hearing. They challenge the court's findings that (1) the prosecution team was not aware of the Noe reports, and (2) the reports were not material under Brady. We only address the materiality issue and do not consider whether the district court erred with regard to the government's knowledge of the Noe reports.

Appellants make two arguments on materiality. First, they contend that the district court should have granted their § 2255 motions and vacated their convictions based solely on the disclosure of the two Noe reports. Second, in the alternative, they contend that the district court erred by deciding the materiality issue without holding an evidentiary hearing. We address each argument in turn.

## A. Materiality

We ordinarily review the district court's dismissal of a Brady claim raised in a § 2255 motion de novo. See Moreno-Morales v. United States, 334 F.3d 140, 145 (1st Cir. 2003). However, "[t]he materiality question under Brady . . . is a mixed question of law and fact." Conley v. United States, 415 F.3d 183, 188 n.3 (1st Cir. 2005) (citing Ouimette v. Moran, 942 F.2d 1, 4 (1st Cir. 1991)). For this reason, we accord some deference to the district court's resolution of the materiality issue. See

*Conley*, 415 F.3d at 188 n.3 ("Some deference to the district court's resolution of fact-dominated questions in the *Brady* context is . . . due, even on collateral review."); *United States v. Sanchez*, 917 F.2d 607, 618 (1st Cir. 1990) ("Due to its 'inherently fact-bound nature,' the district court's determination on the materiality of newly discovered evidence in prosecutorial nondisclosure cases is ordinarily accorded deference." (quoting *United States v. Bagley*, 473 U.S. 667, 685 (1985) (White, J., concurring))). Deference is particularly warranted where, as here, the district court judge reviewing the § 2255 motions was the same judge who presided over the trial. Cf. *United States v. Paladin*, 748 F.3d 438, 443 (1st Cir. 2014) (noting, in an appeal of the denial of a motion for a new trial based on a *Brady* claim, that "[t]he trial judge, having seen and heard the witnesses at first hand, has a special sense of the ebb and flow of the recently concluded trial. Thus, [her] views about the likely impact of newly disclosed evidence deserve considerable deference." (internal quotation marks omitted)).

Under *Brady*, "[a] defendant's right to due process is violated when the prosecution suppresses evidence that is both favorable to the accused and material either to guilt or innocence." *Moreno-Morales*, 334 F.3d at 145 (citing *Brady*, 373 U.S. at 87). To demonstrate that exculpatory evidence is material, appellants must show "a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433 (1995) (quoting Bagley, 473 U.S. at 682) (Souter, J.). A "reasonable probability" is one that "undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678. We must consider the favorable, undisclosed evidence along with the evidence presented at trial, and determine whether it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435; see also id. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."). Withheld information is material under Brady only if it would have been admissible at trial or would have led to admissible evidence. See Ellsworth v. Warden, 333 F.3d 1, 5 (1st Cir. 2003).

Because the Noe reports are relevant in different ways to each appellant, we first analyze the materiality question separately for each of them, and then address the arguments that are applicable to all three.

**1. Paul A.**

The jury convicted Paul A. for his part in overseeing and directing the conspiracy to kill Silva. He contends that the

- 13 -

Noe reports are material because they contradict the government's theory of the case that the DeCologero crew killed Silva. Instead, the reports support Paul A.'s theory that Portalla stored the guns at Silva's house and his crew (including McConnell and Nogueira) murdered Silva. Paul A. further argues that, if he had been aware of the reports before trial, he would have called Noe to testify at trial, and her testimony would have corroborated his version of Silva's murder.

The government counters that the Noe reports themselves are inadmissible hearsay and appellants have failed to demonstrate how their disclosure would have led to material admissible evidence. Therefore, the government argues, and the district court found, that "given the overwhelming weight of the trial evidence, the FBI reports do not raise a reasonable probability of a different outcome." DeCologero II, 2013 WL 3728409, at *6.

At trial, multiple witnesses testified that Paul A. led the DeCologero crew, that he stored guns at Silva's apartment, that he instructed his crew members to kill Silva because she could not be trusted if interrogated by the police, and that his crew members DiCenso, Capozzi, and Meuse killed Silva and disposed of her body. The witnesses who implicated Paul A. in Silva's murder included DiCenso, John P. (Paul A.'s brother), and Regan. Furthermore, as the district court stated, "the witnesses'

- 14 -

testimony was consistent and corroborated by the physical evidence discovered by police."  Id.

Paul A. counters that much of the witness testimony cannot be trusted because it was solicited from former members of the DeCologero crew, many of whom were testifying pursuant to cooperation agreements with the government.  Furthermore, Paul A. argues that none of the physical evidence at trial directly implicated him in the murder.  The physical evidence consisted of bloody bags containing Silva's DNA in a dumpster in Danvers, a security video and Home Depot receipt showing that Capozzi and Meuse had purchased items to assist in disposing of Silva's body, and Meuse's fingerprint on an item in the Danvers dumpster.  While none of this evidence directly connects Paul A. to the crime, it does provide support for DiCenso's testimony that Meuse had killed Silva and that DiCenso and Capozzi had helped Meuse dispose of her body.  Notably, no physical evidence supports the theory of the crime found in the Noe reports that Portalla, McConnell, and Nogueira were responsible for Silva's murder.

Paul A. responds that even if DiCenso and Meuse were involved in Silva's murder, evidence supports his theory that they were actually members of Portalla's crew and were ordered by Portalla, not Paul A., to kill Silva.  Regarding DiCenso, in a discovery letter before trial, the government disclosed to appellants' counsel that DiCenso had told a confidential informant

- 15 -

that he worked for Portalla and would collect money and distribute cocaine and heroin for him. Regarding Meuse, his cell phone records demonstrated that Meuse had made multiple phone calls to Portalla and his girlfriend around the time of Silva's murder in November 1996. According to Paul A., "[t]hese phone calls provided a strong connection between Portalla and Meuse right around the time of Silva's murder." Paul A. Br. at 41-42.

While DiCenso denied at trial that he had worked for Portalla, Paul A. further argues that DiCenso's testimony should not be trusted. He notes that we have previously acknowledged the "strong incentive" DiCenso had "to testify in support of the government's theory of the case." United States v. Capozzi, 486 F.3d 711, 724 (1st Cir. 2007). In Capozzi's direct appeal, we stated:

> DiCenso had pled guilty to a crime punishable by life imprisonment, and . . . DiCenso's cooperation allowed him to be sentenced to a much lower sentence. DiCenso was shown [at trial] to have had a powerful motive -- avoidance of a life sentence and possibly of prison altogether -- to cooperate with the government and to testify falsely if necessary.

Id.

Despite DiCenso's incentive to lie, his testimony that Paul A., and not Portalla, ordered Silva's killing was corroborated by a considerable amount of more reliable evidence. For example, numerous witnesses identified both DiCenso and Meuse as members of

the DeCologero crew, and both men were implicated in a variety of illegal activities tied to Paul A.'s criminal enterprise, including the robberies of drug dealers Albert Sapochetti, Michael "Slim" Stevens, and Jeff North. Although Paul A. presents a modicum of evidence that DiCenso and Meuse might have worked for Portalla, he fails to account for Capozzi, who, according to the physical evidence, also had a direct role in Silva's killing and was identified as a member of the DeCologero crew. Furthermore, a law enforcement officer involved in the investigation into Silva's death expressly disavowed any link between Portalla and the killing, stating that, besides the one occasion where Portalla was seen with Paul A. at Silva's apartment, he "really didn't have any connection between Portalla and Miss Silva."

In addition to DiCenso, Regan and John P. also implicated Paul A. in Silva's murder. Regan testified that, after law enforcement had discovered the weapons at Silva's apartment, Paul A. stated in a meeting with DeCologero crew members that "[w]e got to get the girl away from the law." John P. testified that, around the same time, Paul A. told him that he was debating whether to "get rid of [Silva]" because the police were at her apartment. Moreover, after Silva was murdered, Paul A. told Regan that Meuse and DiCenso had "killed the girl and chopped her up." Paul A. told John P. that "she had to go. Kevin Meuse knew what time it was. He did what he had to do."

- 17 -

In contrast to the physical evidence tying DiCenso, Meuse, and Capozzi to Silva's murder and multiple witnesses testifying that Paul A. ordered the killing, the evidence supporting Paul A.'s alternative explanation for Silva's death found in the Noe reports consists of little more than hearsay and rumors. As the district court stated, the Noe reports "represent a hearsay account by a single witness." DeCologero II, 2013 WL 3728409, at *6. In addition to DiCenso's alleged hearsay statement to a confidential informant that he worked for Portalla and Meuse's multiple calls to Portalla, the total sum of evidence supporting the theory that Portalla ordered Silva killed includes "some early news reports indicating that Portalla and his crew were suspects in the Silva murder," id., testimony that Portalla had been seen at Silva's apartment, and another hearsay report that a confidential informant told an inspector with the Stoneham Police Department that "s/he heard that the girl from Medford that is missing was holding guns for 'Portella.'"

Because the Noe reports themselves are hearsay, they would not have been admissible at trial for the truth of the matters asserted, and "by definition [are] not material, because [they] never would have reached the jury and therefore could not have affected the trial outcome." United States v. Ranney, 719 F.2d 1183, 1190 (1st Cir. 1983). Thus, Paul A. has the burden of demonstrating how the disclosure of the reports would have led to

admissible material exculpatory evidence. Paul A. argues that the reports would have prompted him to call Noe to testify at trial, and her testimony would have verified the allegations made in the Noe reports. However, Paul A. has not submitted any evidence to support this argument. For example, he has not provided an affidavit from Noe or any other evidence that Noe would have been available at trial and, furthermore, that she would have testified in accordance with the reports. See DeCologero II, 2013 WL 3728409, at *7 (noting that Paul A. has "made no showing that Noe would have testified in accordance with [the Noe] reports if she had appeared at trial."). In fact, he makes no representation that, after the disclosure of the Noe reports, he made any attempt to contact or locate Noe, nor does he contend that Noe would have refused to cooperate with him if he indeed had contacted her.

It is also unclear exactly what Noe would have been able to say if she had been called to testify at trial as much of the Noe reports consists of her recounting McConnell's incriminating statements, which would be hearsay. Paul A. argues that "[a] defendant has the right to present evidence of a third party culprit, including calling witnesses that would testify to out-of-court admissions of the third party." Paul A. Br. at 39.

On the one hand, we agree that Noe would have been able to testify to relevant information within her personal knowledge that would challenge the government's theory that the DeCologero

- 19 -

crew killed Silva, such as seeing McConnell come home with his clothes and arms covered with blood in mid-November 1996, observing McConnell and Portalla talking outside of her house that same day, and visiting Silva's apartment with McConnell and Portalla at least ten times. See, e.g., Holmes v. South Carolina, 547 U.S. 319, 328 (2006) (recognizing a defendant's right to introduce evidence of third-party guilt).

On the other hand, Paul A. has failed to demonstrate how Noe could have testified to McConnell's statements themselves.[2] While McConnell's statements would likely qualify as statements against penal interest under Federal Rule of Evidence 804(b)(3)(B), the declarant must "be unavailable as a witness" for that hearsay exception to apply. Fed. R. Evid. 804(a). Paul A. has made no showing that McConnell would have been unavailable at trial. In fact, none of the appellants argue that they would have called McConnell as a witness at trial, or that, if he had testified and denied killing Silva, they would have impeached

---

[2] Paul A.'s reliance on Mendez v. Artuz, 303 F.3d 411 (2d Cir. 2002), is misplaced. In Mendez, the Second Circuit never addressed the admissibility of hearsay statements of a third-party culprit. The court affirmed the district court's decision granting habeas on Brady grounds because the government had suppressed evidence of a third-party culprit. The court did not address the admissibility of that evidence but simply stated that "the suppressed information would have allowed [the defendant] to challenge the state's motive theory . . . either through cross-examination or the presentation of contradictory testimony [which] . . . would have allowed the defendant to create reasonable doubt that he was the shooter." Id. at 414.

McConnell by introducing his statements in the Noe reports as prior inconsistent statements under Federal Rule of Evidence 613.[3]

Paul A. asks us to vacate his conviction based solely on the disclosure of two hearsay reports. Given the strength of the trial evidence against him, the inadmissibility of the Noe reports themselves, the failure to demonstrate that the reports would have led to the discovery of admissible exculpatory evidence, and according "[s]ome deference" to the district court's fact-intensive analysis, Conley, 415 F.3d at 188 n.3, Paul A. has not "establish[ed] a reasonable probability of a different result" at trial. Strickler v. Greene, 527 U.S. 263, 291 (1999).

**2. Paul J.**

Paul J.'s materiality claim is weaker than Paul A.'s. Unlike Paul A., Paul J. was not convicted of playing a role in Silva's murder itself. Instead, his witness tampering convictions stem from his role in the failed attempt to kill Silva by overdosing her with heroin. While the Noe reports provide an alternative explanation for how Silva was actually killed, the reports do not directly contradict the evidence that Paul J. was ordered by Paul A. to buy the heroin needed to kill Silva, that

---

[3] Federal Rule of Evidence 613(b) permits "[e]xtrinsic evidence of a witness's prior inconsistent statement . . . if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires."

Paul J. bought the heroin, and that Meuse and DiCenso gave Silva the heroin but she did not die.

As with the evidence incriminating Paul A. in Silva's murder, DiCenso's testimony implicating Paul J. in the attempted overdose was also supported by other testimony. For example, Antonio Centeno, a heroin dealer, testified that Paul J. had requested heroin from him "strong enough for an overdose," and Centeno sold him 30 bags. A few days after the purchase, Paul J. returned and told Centeno that the heroin "wasn't strong enough" to "take care of someone out of the way." Additionally, John P. testified that he had heard Paul A. tell his son that the heroin intended to kill Silva "didn't work." In another conversation, John Jr. told John P. that Meuse had given Silva the heroin and that it had failed to kill her.

Paul J. contends that, despite this evidence, the Noe reports are "core exculpatory evidence sufficient in weight to alter the entire balance of the case against [him]." Paul J. Br. at 39. He argues that, if the jury had heard testimony indicating that McConnell was involved in Silva's murder, it could have concluded that Portalla's crew was behind the entire conspiracy to kill Silva and would have discounted any testimony implicating Paul J. in the attempted heroin overdose. However, like Paul A., Paul J. fails to recognize that the reports themselves are inadmissible hearsay. Furthermore, he fails to demonstrate how

the reports would have led to admissible evidence. He has not provided any evidence to demonstrate that the jury would have heard any testimony implicating McConnell in Silva's death. He simply assumes that Noe (or someone else) would have testified in accordance with the allegations made in the Noe reports. Considering that the Noe reports have less relevance to Paul J.'s conduct than to Paul A.'s, and we have already found that the reports do not "undermine confidence in [Paul A.'s] verdict," Kyles, 514 U.S. at 435, we also find that, providing some deference to the district court, Paul J. has failed to establish a reasonable probability of a different result at trial.

**3. John Jr.**

John Jr. has the weakest materiality claim of all the appellants. He was not charged with any offense related to Silva's killing. Instead, he argues that the murder of Silva "loomed over the entire trial and was critical to the credibility of the key witnesses against John Jr.: Stephen DiCenso and Tommy Regan." John Jr. Br. at 7. Specifically, he contends that the Noe reports are material for their "ability to impeach Regan and DiCenso as to their testimony surrounding the Silva murder [and] would have cast doubt on their testimony as a whole." Id. at 30. Yet, John Jr. never explains how he could have introduced the reports at trial to impeach Regan and DiCenso. The reports do not purport to repeat any statements made by Regan or DiCenso. In fact, neither of them

is even mentioned in the reports.  Therefore, it is doubtful that the reports could have been used at trial to impeach their testimony under the Federal Rules of Evidence.  See, e.g., Fed. R. Evid. 608, 613.

Moreover, as explained above, Regan and DiCenso's testimony regarding the Silva murder was corroborated by physical evidence and testimony of other witnesses.  This corroboration significantly lessens any impeachment effect of the Noe reports, especially regarding John Jr.'s convictions, which are unrelated to the Silva killing.  As the district court stated, because the Noe reports "do not raise a reasonable probability of a different outcome on the counts related to the Silva killing . . . [a] fortiori, they do not raise a reasonable probability of a different outcome on unrelated counts."  DeCologero II, 2013 WL 3728409, at *7.

**4. Arguments applicable to all appellants**

All appellants contend that the Noe reports are material for two additional reasons.  First, they argue that, if the Noe reports were disclosed before trial, the district court would have granted their pre-trial discovery motions to obtain additional information regarding the connection between Portalla and Silva's murder, in particular Paul A.'s motion for the identities of two confidential informants, one who stated that DiCenso said that he worked for Portalla and the other who stated that Silva was holding

guns for Portalla. However, the district court judge who denied the discovery motions is the same judge who denied their § 2255 motions, and she rejected appellants' argument that the Noe reports would have made any difference. See DeCologero II, 2013 WL 3728409, at *7 (stating that "[w]hatever further evidence there might have been about Portalla, McConnell, and Nogueira, Paul A. did not need the FBI reports to find it").

Second, appellants contend that they could have used the Noe reports at trial to demonstrate that law enforcement failed to sufficiently investigate the connection between Portalla's crew and Silva's murder and were biased by focusing their investigation on the DeCologero crew. Given the considerable evidence tying the DeCologero crew to Silva's death, we agree with the district court that, even if the Noe reports could have been introduced for this purpose, there would not be a reasonable probability of a different outcome at trial. See id. at *6.

## B. Evidentiary Hearing

In the alternative, appellants argue that the district court erred by making its materiality determination, and denying their § 2255 motions to vacate their convictions, without holding an evidentiary hearing. We review a district court's decision not to hold an evidentiary hearing for abuse of discretion. Owens v. United States, 483 F.3d 48, 57 (1st Cir. 2007).

Pursuant to 28 U.S.C. § 2255(b), a district court "shall . . . grant a prompt [evidentiary] hearing" "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." Despite this seemingly petitioner-friendly standard, we have stated that "[e]videntiary hearings on § 2255 petitions are the exception, not the norm," Moreno-Morales, 334 F.3d at 145, and "the petitioner bears the burden of establishing the need for an evidentiary hearing." United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993).

When reviewing a district court's denial of an evidentiary hearing, "we take the petitioner's credible allegations as true." Owens, 483 F.3d at 57. A district court may deny an evidentiary hearing when "the movant's allegations, even if true, do not entitle him to relief, or . . . [when] the movant's allegations need not be accepted as true because they state conclusions instead of facts, contradict the record, or are inherently incredible." Id. (internal quotation marks omitted). Where, as here, the judge who presided at the petitioners' trial is the same judge who decided the § 2255 motion, "the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing." McGill, 11 F.3d at 225; see also United States v. Baxter, 761 F.3d 17, 24 n.5 (D.C. Cir. 2014) ("A district

judge's decision not to hold an evidentiary hearing before denying a § 2255 motion is generally respected as a sound exercise of discretion when the judge denying the § 2255 motion also presided over the trial in which the petitioner claims to have been prejudiced." (internal quotation marks omitted)).

In their § 2255 motions, all appellants allege that if the prosecution had disclosed the Noe reports, they would have called Noe as a witness, and she would have testified consistently with the reports that Portalla, McConnell, and Nogueira were involved in Silva's murder. In its ruling denying the motions, the district court did not take this allegation as true, and instead found that appellants had "made no showing that Noe would have testified in accordance with [the Noe] reports if she had appeared at trial." DeCologero II, 2013 WL 3728409, at *7.

Because the district court denied their request for an evidentiary hearing, appellants contend that the court should have taken this allegation as true. However, appellants did not present any evidence to the district court to support their conclusory claim that Noe would have testified consistently with the statements that she had made in the reports. For example, they did not submit an affidavit from Noe, nor did they make any representation to the district court that they had located Noe or that she would have been available to testify at trial if called as a witness. Instead, they argue that an affidavit from Noe was

unnecessary because the Noe reports "sort of speak[] for [them]sel[ves]."[4]  However, as explained above, the reports are inadmissible hearsay, and appellants have the burden of demonstrating how the reports would have led to admissible evidence.  See Ellsworth, 333 F.3d at 5.  Because appellants have

[4]  At oral argument, counsel for Paul A. conceded that appellants never submitted an affidavit from Noe describing what she would have said if called at trial:

> Justice Souter: Is it correct that in the habeas proceeding you did not either call Noe as a witness or present an affidavit from Noe as to what she would testify?
>
> Counsel for Paul A.: We did not present an affidavit. . . . The Judge never ordered affidavits. . . .
>
> Justice Souter: You are the one who is bringing habeas.  The Judge doesn't have to order it.
>
> Counsel for Paul A.: That could have been developed in an evidentiary hearing.
>
> Judge Lipez: But you are trying to make the case that there has to be an evidentiary hearing.  Wouldn't the submission [of an affidavit] enhance your case that there should have been an evidentiary hearing? . . . You had an opportunity to convince the judge that, at an evidentiary hearing, [Noe] might be prepared to testify in conformity to that 302 report . . . but you never made the effort to do that.
>
> Counsel for Paul A.:  No, that is correct. . . . We did not present that to the district judge, and I have no explanation for it, other than that the report sort of speaks for itself. . . .

provided no factual basis to support their conclusory allegation that Noe would have testified in accordance with the reports, the district court did not abuse its discretion by denying their motions without holding an evidentiary hearing.  See Owens, 483 F.3d at 57.

Affirmed.